# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PAMELA JOHNSON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF MARSEILLES, d/b/a CITY OF ) <br> MARSEILLES POLICE DEPARTMENT, ) <br> and JAMES BRADLEY HERZOG. ) <br> ) <br> Defendants. ) <br> ) | 06 CV 0955 <br><br> Judge Joan H. Lefkow |

## MEMORANDUM OPINION AND ORDER

Pamela Johnson filed a three-count complaint against her former employer, City of Marseilles, and James Bradley Herzog, alleging claims of sexual harassment under Title VII (Count I) and 28 U.S.C. § 1983 (Count II), as well as a claim of retaliation under Title VII (Count III). Before the court is defendants' motion for summary judgment on all counts. For the following reasons, defendants' motion for summary judgment [#21] is granted with respect to plaintiff's § 1983 claim (Count II) and denied with respect to her Title VII claims for sexual harassment (Count I) and retaliation (Count III).

## STANDARDS

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes. The

party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In the context of employment discrimination, "summary judgment is warranted where the evidence, interpreted favorably to the plaintiff, could not persuade a reasonable jury that the employer had discriminated against the plaintiff." *Jones* v. *Union Pacific R.R. Co.*, 302 F.3d 735, 739–40 (7th Cir. 2002) (internal quotation marks and alterations omitted).

## BACKGROUND[1]

Johnson was employed by the City of Marseilles ("the City") as a "dispatcher/911 operator and administrative assistant" from September 2000 until November 2004. Defs.' Local Rule 56.1 Statement (hereinafter Defs.' Statement) ¶¶ 1, 70. The City of Marseilles Police Department, in order of chain of command, consists of the chief of police, James Hovious; a lieutenant, Kenneth Sangston; two sergeants, Brian Faber and defendant J. Bradley Herzog; five

---

[1] Unless otherwise specified, the facts recited below consist only of those that both parties have admitted.

2

full-time sworn police officers; and four full-time dispatchers, of which Johnson was one. *Id.* ¶ 5. Chief Hovious was the immediate supervisor of the dispatchers and, in his absence, Lieutenant Sangston supervised them. *Id.* ¶ 6.

Johnson alleges that she was sexually harassed by Herzog, both in person and through emails. Johnson and Herzog did not work the same shift. *Id.* ¶ 16. Herzog sent Johnson at least fifteen sexually-suggestive emails in which he used sexually-explicit language, made overt solicitations for sex, and on at least one occasion described a particular sexual act he desired to engage in with her. Defs.' Statement ¶¶ 38–49; Pl.'s Statement ¶ 3. Johnson saved ten such emails from Herzog, the earliest dated July 25, 2002 and the latest dated February 14, 2004. Defs.' Statement ¶ 37. Johnson also alleges that Herzog physically assaulted her on multiple occasions, including (1) a number of incidents when he tried to touch her buttocks and (2) an incident that occurred in the police station around Halloween 2003 when he tried to kiss her, put his hands along the side of her breasts, and turned her over a desk before she freed herself from him. Defs.'s Statement ¶ 56; Pl.'s Resp. to Defs.' Statement ¶ 56.

Johnson also alleges that Chief Hovious sexually harassed her on a number of occasions when he (1) said to her in front of coworkers at a police cookout in 2001, "Pam[,] we know how familiar you are with back seats of cars"; (2) made a comment to her about trying to get Herzog to have sex with an unattractive property owner so that they could hunt on the land; (3) in a conversation in 2003, told her that an officer had confronted him about a rumor that Hovious and Johnson were caught having sex in Hovious's office, to which Hovious had responded that it was not in the office but at the convention center; (4) referred to Johnson on one occasion as a

3

"cocksucking smartass"; and (5) frequently referred to Johnson as "bitch." Defs.' Statement ¶¶ 60–63, 76.

The City had a written policy prohibiting sexual harassment, copies of which were distributed to all employees. Defs.' Statement ¶¶ 9–10. Herzog was a shift supervisor for patrolmen and did not have any significant supervisory or disciplinary authority over the dispatchers. Defs.' Statement ¶ 14–15. Nevertheless, the parties agree that under the City's sexual harassment policy, Herzog and Sangston, like Hovious, were "supervisory personnel" for reporting purposes. Pl.'s Statement ¶ 1. Johnson admits that she engaged in sexually suggestive conversation with other members of the department; as Johnson explained in her deposition, "that was the environment" and it was "not uncommon." Defs.' Statement ¶ 58. Johnson also admits that one of the ten offensive emails that she saved was sent by Herzog in response to an email from Johnson in which she had written only the words "did you forget me?" Defs.' Statement ¶ 39.

On July 25, 2002, Herzog sent Johnson an email that was particularly vulgar.[2] Around the end of February or early March 2003, Johnson opened this email on the screen of her computer and showed it to Sangston. Defs.' Statement ¶ 65; Pl.'s Resp. to Defs.' Statement ¶ 65. According to Johnson, Sangston replied "Oh my God[,] Pam[,] this is bad," and said that he

---

[2] The entire contents of the email were as follows:

I heard you are working and I get up to check my email cause I just know you sent me one and nothing...whats up with that shit...

just giving you a hard time...how about a hard time of bending you over and slamming my hard cock in and out of you until we both explode all over?????????????

Defs.' Statement ¶ 49.

4

would take care of it. Defs.' Statement ¶ 65. While the parties agree that this conversation between Sangston and Johnson took place, Sangston claims that, at Johnson's request, he promised her that he would not tell anyone about the email.[3] Defs.' Resp. to Pl.'s Statement ¶ 8. Nevertheless, within a few days of seeing the July 25, 2002 email, Sangston informed Hovious about it. Defs.' Resp. to Pl.'s Statement ¶ 8. According to defendants, Hovious asked Sangston if he thought Johnson's showing him the email was a complaint, and Sangston said, "[N]o, I didn't take it as a complaint, and she promised me [*sic*] not to tell anybody." Defs.' Reply to Pl.'s Statement ¶ 8. According to defendants, Hovious then asked Sangston, "[W]ell, did you tell her to come to me and bring it up?"; when Sangston responded, "[Y]eah," Hovious replied, "I'm not going to solicit any complaints from her. We'll see if she comes to me . . ." *Id.* Neither Sangston nor Hovious confronted Herzog in response to Johnson's reporting to Sangston about the offensive email. *See* Defs.' Reply to Pl.'s Statement ¶ 8.

Johnson alleges that on January 20, 2004, she attempted to speak with Hovious about Herzog's conduct, but before she was able to provide any details, Hovious cut her off with the comment, "Brad is Brad."[4] Pl.'s Resp. to Def.'s Statement ¶ 68; Def.'s Statement, Ex. 1, at 000015.

---

[3] Johnson has neither admitted nor denied this fact, which was asserted in defendants' reply to Johnson's Rule 56.1 statement of material facts.

[4] Defendants have neither admitted nor denied these facts, which were asserted in Johnson's response to defendants' Rule 56.1 statement of material facts.

In mid- to late- February 2004, Johnson showed Sangston another sexually-suggestive email from Herzog, this one dated February 14, 2004.[5] Pl.'s Resp. to Defs.' Statement ¶ 66. On March 11, 2004, Sangston had another conversation with Johnson in which he told her that he had done some research and determined that she was the victim of sexual harassment and that she needed to report the harassment to the chief and the police commissioner. Defs.' Statement ¶ 67.

On or about April 30, 2004, Johnson met with Hovious and Sangston about the offensive emails, which—she had made clear to them—she wanted Herzog to stop sending. Pl.'s Statement ¶¶ 10, 13. Based on these conversations, Hovious believed that (1) Johnson's complaints were made in good faith; (2) Herzog's emails to Johnson were not consensual; and (3) Herzog was sexually harassing Johnson. Pl.'s Statement ¶¶ 10–14. Defendants admit that Johnson felt physically threatened and frightened by Herzog. Pl.'s Statement ¶ 34.

On May 24, 2004, Johnson met again with Hovious and Sangston and informed them that she felt overwhelmed and could not work anymore, and that she was not feeling well. Pl.'s Statement ¶ 19. Johnson had to leave the meeting because she was sick. Pl.'s Statement ¶ 20.

On June 10, 2004, Johnson was assigned to work on the same night shift as Herzog, which would require her to be alone with Herzog. Pl.'s Statement ¶ 17. Johnson alleges that the

---

[5] The entire contents of the email were as follows:

> I see that you have several cats. While patrolling last night and the numerous checks of your house I saw two or three cats hangin out at your garbage can. Quit throwing your dirty underwear away and they might not come back. LOL
>
> Hank

Defs.' Statement ¶ 38.

shift reassignment was an act of retaliation against her in response to her complaints about sexual harassment. Defendants claim that the reassignment was the result not of retaliation but of Mayor Donald Bolatto's decision, long before he had ever heard of Johnson's complaint, to implement a department-wide change in shifts in order to reduce the police department's operating budget. Defs.' Statement ¶ 21. Defendants further allege that Johnson's reassignment was based on the bidding system put into place by Police Commissioner Gary Lewey in which each dispatcher bid on his or her shift preference and bid preferences were ranked by the seniority of each dispatcher. Defs.' Statement ¶¶ 24. Johnson's shift preferences were subordinate to two dispatchers who had been hired earlier. Defs.' Statement ¶ 32. Thus, defendants argue, the decision that ultimately resulted in Johnson's shift assignment was initiated by the mayor and implemented by Commissioner Lewey, neither of whom knew about Johnson's sexual harassment complaints when they devised the plan. *See* Defs.' Statement ¶¶ 29–30. Defendants also argue that, given her seniority over at least one other dispatcher, Johnson and Herzog would not have been on the same night shift if Johnson had so chosen. Defs.' Statement ¶ 32. Johnson denies that she was given a choice as to whether she would be assigned to the night shift with Herzog. Pl.'s Resp. to Def.'s Statement ¶ 32.

On June 16, 2004, Johnson filed her first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that the defendants discriminated against her on the basis of her sex. Def.'s Answer to Pl.'s Compl. ¶¶ 24–25. Hovious had actual knowledge that Johnson filed the charge of discrimination with the EEOC. *Id.* ¶ 27.

Hovious learned from another dispatcher that Johnson thought that her shift reassignment was an act of retaliation against her. Pl.'s Statement ¶ 20. Hovious took no action to alleviate

Johnson's concerns about the shift reassignment, nor did he ever assure her that Herzog had been disciplined for the offensive conduct that she had complained about. Pl.'s Statement ¶¶ 21, 25.

Within a few days of the shift reassignment, Johnson was under a doctor's direction not to return to work. Pl.'s Statement ¶ 22. On October 27, 2004, City Attorney Anita Kopko directed Johnson to report to the chief of police within seven days to discuss her return to work and advised her that if she failed to do so, her employment would be deemed terminated. Defs.' Statement ¶ 69; Hovious Aff. ¶ 14, Ex. 43. On November 5, 2004, Kopko sent Johnson a letter informing her that Johnson's employment with the city was deemed terminated for failure to comply with Kopko's previous directions. Defs.' Statement ¶ 70; Hovious Aff. ¶ 14, Ex. 43.

## DISCUSSION

### I. Count I: Johnson's Title VII Sexual Harassment Claim

A work environment can be described as hostile for purposes of Title VII if "a reasonable person would find it offensive and the plaintiff actually perceived it as such." *Patton* v. *Keystone RV Co.*, 455 F.3d 812, 815 (7th Cir. 2006) (quoting *Hostetler* v. *Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000)).

Defendants argue that the work environment was not objectively hostile, citing evidence that in the midst of the allegedly harassing emails, Johnson sent friendly emails to Herzog, including the message "did you forget me?," Defs.' Statement ¶ 39, and was willing to meet with him socially on Sundays. While such evidence may weigh against Johnson at trial, it does not conclusively indicate that the environment was either objectively (as defendants suggest) or subjectively not hostile and is therefore not an appropriate ground for granting summary judgment.

Defendants also argue that the City was not on notice of the harassment while it was occurring and, once learning of the harassment, acted reasonably to stop it. "Generally, an employer may raise an affirmative defense to a claim under Title VII by showing that it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior' and 'that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" *Loughman* v. *Malnati Organization Inc.*, 395 F.3d 404, 407 (7th Cir. 2005) (quoting *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998)). Thus, "[i]n cases involving harassment by a coworker, an employer is liable only if 'it negligently failed to take reasonable steps to discover or remedy the harassment.'" *Id.* (quoting *Smith* v. *Sheahan*, 189 F.3d 529, 533 (7th Cir.1999)).

Defendants cite evidence that Hovious, upon hearing from Sangston about the July 25, 2002 email, asked Sangston if he construed it as a complaint when Johnson showed him the email. Sangston testified that he told Hovious that he did not consider it to be a complaint and also that Johnson had asked Sangston not to tell anyone else about it. According to Sangston, Hovious then said, "I'm not going to solicit any complaints from her. We'll see if she comes to me . . ." Defs.' Reply to Pl.'s Statement ¶ 8. Defendants rely on *Bombaci* v. *Journal Community Pub. Group, Inc.*, 482 F.3d 979 (7th Cir. 2007), for the proposition that this "isolated incident [i.e., the July 25, 2002 email] is insufficient to put the City on notice that the Plaintiff was being sexually harassed." Def.'s Reply at 8–9.

In *Bombaci*, the court found that "isolated incidents" of sexually suggestive conduct were insufficient to notify the supervisor that the plaintiff was being sexually harassed "because they

9

did not come close to creating an actionable hostile work environment." 482 F.3d at 985 n.2. Those incidents were (1) the plaintiff's supervisor's witnessing of the plaintiff's co-worker "making sexual jokes from time to time"; (2) the same supervisor's "remov[al] [of] pictures of women in bikinis" from the work area of two of the plaintiff's co-workers; and (3) another manager's learning that a third co-worker had "made inappropriate comments to [the manager's] niece." *Id.* In this case, unlike *Bombaci*, the plaintiff has proffered evidence sufficient for a reasonable jury to conclude that the sexual conduct created a hostile work environment under the law and, moreover, that management did not have to piece it together from the surroundings but rather that plaintiff herself (as opposed to a third party) had complained of being sexually harassed and that her supervisor (Hovious) was aware of both the fact that she had complained and the substance of the complaint. This was certainly sufficient to put the City on notice.

Defendants also argue that Sangston told Hovious that Johnson "did not want Sangston to tell anyone" and that Hovious therefore "acted reasonably in respecting the confidence." Def.'s Reply at 10. Nevertheless, Sangston himself—the principal keeper of the confidence—reported to Hovious about the email, and Hovious was concerned enough to ask Sangston whether he construed his exchange with Johnson about the email as a complaint. The defendants have admitted that under the City's sexual harassment policy, both Sangston and Hovious were "supervisory personnel" for reporting purposes and that it took no action to investigate or remedy Johnson's concerns about sexual harassment. Once they had notice, they had a duty to act without regard to Johnson's instructions not to tell anyone. *See Parkins* v. *Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (citing *Baskerville* v. *Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir.1995)) ("An employer's legal duty in co-employee harassment cases

will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees. . . . With respect to the extent of the notice given to an employer, a plaintiff cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed.") (internal citations and quotation marks omitted). Given that Hovious had actual notice[6] about the content of the July 25, 2002 email, which was objectively offensive and potentially threatening, there is an issue of material fact as to whether the City negligently failed to take reasonable steps to discover or remedy the harassment. The court must therefore deny summary judgment on Johnson's Title VII sexual harassment claim (Count I).

## II. Count II: Johnson's § 1983 Sexual Harassment Claim

In Count II of her complaint, Johnson brings a claim for sexual harassment pursuant to 28 U.S.C. § 1983. Defendants argue that Johnson's § 1983 claim is time-barred because Johnson received the February 14, 2004 email—the last act of alleged sexual harassment by Herzog—more than two years before February 21, 2006, the date she filed her complaint in this case. Johnson concedes that the statute of limitations for claims under § 1983 is the same as that which governs personal injury actions under Illinois state law—two years. *Hileman* v. *Maze*, 367 F.3d 694, 696 (7th Cir. 2004) (citing 735 Ill. Comp. Stat. 5/13-202). Johnson argues, however, that the final act of harassment was not the last act by Herzog, but the last act by the City. Johnson contends that "[t]he City's actions extend well beyond the February 14, 2004 email" in that "[t]he City is responsible for Hovious' negligence." Pl.'s Resp. at 7. More specifically, Johnson

---

[6] Regarding the July 25, 2002 email, Sangston testified, "I basically went in and I told the chief what I had seen." Pl.'s Statement, Ex. 1 (Sangston's Dep.), at 14.

argues that "Hovious allowed the harassment to continue until May 14, 2004 when he finally told Herzog to stop." *Id.* Johnson also suggests that the statute may not have begun to run until November 4, 2004, the date when the City sent her the termination letter.

The Seventh Circuit has established that "any discrete acts that . . . occurred outside of the limitations period for § 1983 actions are barred, but acts that contribute to a hostile work environment may be considered so long as one of the contributing acts occurred within the limitations period." *Hildebrandt* v. *Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1036 n.18 (7th Cir. 2003). The November 4, 2004 termination letter, a discrete act, thus would not bring Hovious's acts of harassment—the conduct at the heart of Johnson's § 1983 claim—within the statute of limitations period. Johnson, moreover, has failed to articulate either a factual basis or a legal theory for her contention that the statute of limitations began to run not when Johnson became aware of the last act of harassment by Herzog but upon Hovious's telling Herzog to stop harassing her.

Johnson further argues that even if the final act of harassment was Herzog's email of February 14, 2004, she did not actually open the email until February 21, 2004. In support of this argument, Johnson offers an affidavit in which she testifies that she did not read the email until February 21, 2004, and that that was the first time she saw its contents. In reply, the defendants offer two items as evidence that Johnson has already admitted to opening the email prior to February 21, 2004. First, in a memorandum summarizing the various acts of harassment to which she was subjected, Johnson writes:

> Feb. 14th 2004 – Last email received about cats in my garbage.
>
> Sat. Feb. 21st, 2004
>
> After receiving the email from Sgt Herzog I spoke with Lt. Sangston once again and I opened the email *I had saved* under the file critter . . .

Def.'s Statement, Ex. 1, at 000015 (emphasis added). Defendants argue that, on its face, Johnson's own language indicates that she opened the email on February 14, 2004 and that, in any case, she initially opened it some time before February 21, 2004. Second, in her deposition, Johnson testified as follows:

> Q. Any explanation for the seven day delay between the e-mail being sent and you speaking with Sangston on Saturday morning?
> A. Just waiting to speak to him for the opportunity. [*sic*]
> Q. Do you recall when you opened up that e-mail?
> A. No, sir.
>     *       *       *
> Q. . . . -- so you had previously opened the e-mail and saved it under the file called critter, correct?
> A. I'm not certain when I put it in that file.

Def.'s Reply, Ex. (Johnson's Dep.), at 79–80. The knowledge to which Johnson attests in her affidavit is thus contradicted by her deposition testimony, where she suggested that she had opened the email prior to February 21 and, moreover, denied remembering when she had first opened the email.

The Seventh Circuit has established that "[a]ffidavits, though signed under oath by the affiant, are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel* v. *Wal-Mart Associates, Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). In *Beckel*, the court rejected the plaintiff's attempt to create an issue of fact by offering an affidavit in which the

plaintiff attested to knowledge that, in her deposition, she had denied having. *Id.* at 623–24.

Johnson offers no explanation for her newfound recall, nor does she present any plausible argument that the affidavit is not contradicted by her deposition testimony. Consequently, the affidavit is entitled to zero weight for purposes of this motion for summary judgment. Johnson has thus failed to show that any of the harassment to which she was allegedly subjected occurred on or after February 21, 2004. The court therefore finds that Johnson's § 1983 claim is time-barred and must grant summary judgment in favor of the defendants on Count II of her complaint.[7]

### III. Count III: Johnson's Title VII Retaliation Claim

In Count III of her complaint, Johnson brings a claim for retaliation pursuant to Title VII, alleging that in retaliation for her complaints to Hovious about the sexual harassment by Herzog, Hovious assigned her to work alone on the night shift with Herzog. Johnson alleges that learning of the shift change made her so sick that she had to go on medical leave and that while on medical leave, she was terminated, the sum of which constitutes a constructive discharge. As with other Title VII claims, a claim for retaliation can be established through either a direct or an indirect method of proof:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward, the one that is unrelated to *McDonnell Douglas* [*Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)], is to present direct evidence . . . that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the

---

[7] Having found that Johnson's § 1983 claim is time-barred, the court need not consider defendants' alternative argument in favor of summary judgment on the § 1983 claim—that Johnson has failed to provide sufficient evidence to support public entity liability under § 1983.

14

plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

*     *     *

The second route to summary judgment, the adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

*Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *accord Bernier* v. *Morningstar, Inc*, 495 F.3d 369, 375–76 (7th Cir. 2007).

Because Johnson has not provided any evidence about a similarly situated employee who did not file a charge and was not subjected to an adverse employment action, she must proceed under the direct method: provide evidence that she engaged in protected conduct and as a result suffered an adverse employment action. There is no question that Johnson has presented evidence that she engaged in protected activity when she, on a number of occasions, complained about sexual harassment and, in June 2004, filed a charge of discrimination with the EEOC.

Johnson argues that she was subject to adverse employment action in the form of a constructive discharge when Hovious, who knew about Johnson's sexual harassment complaints and personally believed that Herzog was sexually harassing her, nevertheless assigned her to work alone on the night shift that was supervised by Herzog. Defendants argue that Johnson failed to allege in her complaint that she was constructively discharged and cannot raise this theory for the first time in her response memorandum. Although Johnson did not use the term "constructive discharge" in her complaint, the court finds that the allegations presented in her complaint were sufficient to put the defendants on notice of such a claim.

15

Defendants further argue that more than a hostile work environment is necessary in order to establish a constructive discharge, citing *Wolf* v. *Northwest Indiana Symphony Society*, 250 F.3d 1136 (7th Cir. 2001), for the propositions that "[a]bsent extraordinary conditions, 'a complaining employee is expected to remain on the job while seeking redress.'" *Id.* at 1143 (quoting *Perry* v. *Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)). As the *Wolf* court explained, "[a]n employee can assert a claim of constructive discharge when he is forced to resign because his working conditions, from the standpoint of the reasonable employee, have become unbearable." *Id.* at 1142. In finding that the plaintiff's situation "was far from the extreme situation warranting a resignation as the only alternative to avoiding or overcoming an intolerable situation," the court noted that (1) it was "telling" that the plaintiff had never reported the harassment to anyone at the defendant institution; and (2) in his resignation letter to the defendant's board of directors, the plaintiff commended his alleged harasser as "being 'the best boss he ever had'"—"hardly the actions of an employee who is faced with an objectively intolerable working environment." *Id.* at 1143. Here, in contrast to *Wolf*, the plaintiff's supervisor, Hovious, has acknowledged not only that he was aware of plaintiff's complaints about sexual harassment but also that it was his personal belief that the plaintiff was being harassed. The court finds that Johnson has proffered sufficient evidence for a reasonable jury to conclude that her work conditions, from the standpoint of a reasonable employee, had become unbearable.

Defendants also argue that Johnson has failed to establish the causation element of her retaliation claim. Johnson must provide evidence that she suffered the adverse employment action *as a result* of her protected conduct. *See Stone*, 281 F.3d at 644. The Seventh Circuit has

found that "a 'telling temporal sequence' can demonstrate a causal link between adverse action and protected conduct." *See Fanslow* v. *Chicago Mfg. Center, Inc.*, 384 F.3d 469, 485 (quoting *Holland* v. *Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1315 n. 3 (7th Cir.1989)). Defendants focus their argument on the four-month lapse between the time that Johnson filed a charge of discrimination with the EEOC in June 2004 and the time that she was officially terminated in fall 2004. *See* Def.'s Mot. at 7 (citing *Filipovic* v. *K & R Exp. Sys., Inc.*, 176 F.3d 390 (7th Cir. 1999) (holding that a four-month gap between the protected conduct and the adverse employment action weighed against a finding of causation)). The adverse employment action alleged by Johnson, however, occurred when she was assigned to work alone on the same shift that Herzog supervised—a decision that Hovious informed Johnson of on June 10, 2004, less than a month after her last meeting with Hovious and Sangston concerning her sexual harassment complaints, on May 24, 2004.

Defendants further argue that suspicious timing alone is insufficient to demonstrate causation and that Johnson has failed to present evidence that gives reason to doubt the truthfulness of the defendants' proffered reasons for Johnson's shift reassignment. The defendants claim that the Johnson's reassignment was the result of a bidding system that was initiated by Mayor Bolatto and implemented by Commissioner Lewey in which each dispatcher bid on his or her shift preference and bid preferences were ranked by the seniority of each dispatcher. Defendants claim that this plan was set into motion long before Bolatto and Lewey were even aware of Johnson's sexual harassment complaints.

Johnson, however, has presented evidence that given the relative seniority of the dispatchers and their actual bids, the bidding system gave Hovious the choice of assigning

17

Johnson to either of two night shifts—the "A" shift or the "B" shift. Given evidence that Hovious had discretion to assign Johnson to an alternative shift but chose to assign her to work alone on the same shift as Herzog, the court finds that Johnson has proffered sufficient evidence for a reasonable jury to conclude that she suffered the alleged adverse employment action as a result of her protected conduct. The court must therefore deny defendants' motion for summary judgment as to Johnson's Title VII retaliation claim (Count III).

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment [#21] is granted in part and denied in part. Summary judgment in favor of the defendants is granted with respect to Count II of her complaint, plaintiff's §1983 claim, but denied with respect to Counts I and III, her Title VII sexual harassment and retaliation claims.

Dated: January 8, 2008         Enter:_____

                                              JOAN HUMPHREY LEFKOW
                                              United States District Judge